-N THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

GLENDA DIANNE                )
PENNINGTON,                )
    Claimant,                )
v.                )        CIVIL ACTION NO.
NANCY A. BERRYHILL,                )        6:17-CV-01963-KOB
ACTING COMMISSIONER OF    )
SOCIAL SECURITY,                )
    Respondent.                )

## MEMORANDUM OPINION

### I. INTRODUCTION

On December 30, 2014, the claimant protectively applied for disability and disability insurance benefits under Title II of the Social Security Act. The claimant initially alleged disability beginning December 28, 2014, because of depression, anxiety, obsessive-compulsive disorder, panic attacks, eating disorder, complex regional pain syndrome, chronic migraines, social anxiety, and several suicide attempts.  The Commissioner denied the claims on April 2, 2015. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on August 31, 2016. (R. 17, 20 71).

In a decision dated January 24, 2017, the ALJ found that the claimant was not disabled as defined by the Social Security Act, rendering her ineligible for Social Security benefits. On October 5, 2017, the Appeals Council denied the claimant's request for review. Consequently,

1

the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). (R. 1, 14).

Because substantial evidence does not support the ALJ's findings regarding the weight he gave the claimant's treating physician and a consulting examiner, this court REVERSES and REMANDS the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUE PRESENTED

Whether the ALJ erred in failing to state the weight he gave to the opinion of the consultative examiner Dr. Susan Corbin and in his description of the substance of Dr. Corbin's opinion.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if he applied the correct legal standards and substantial evidence supports his factual conclusions. *See* 42 U.S.C. §405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. But this court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. And a reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

The ALJ "must state with particularity the weight given to different medical opinions" and the reasons for his finding; the failure to do so is reversible error. *Romeo v. Comm'r of Social Security*, 686 F. App'x 731, 732 (11th Cir. 2017) (citing *Winschel v. Comm'r of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011)). The ALJ's stated reasons must be legitimate and supported by the substantial evidence in the record. S*ee Tavarez v. Commissioner of Social Security*, 638 F. App'x 841, 847 (11th Cir. Jan. 7, 2016) (finding that the "ALJ did not express a

legitimate reason supported by the record for giving [the consulting physician's] assessment little weight.").

## V. FACTS

The claimant was forty-eight years old at the time of the ALJ's final decision; has a high school education; has past relevant work as a physical therapy assistant; and alleges disability based on major depressive disorder, anxiety, complex regional pain syndrome, fibromyalgia, migraine headaches, and chronic and severe pain. (R. 20, 25).

*Physical and Mental Impairments*

In November 2007, the claimant was involved in an automobile accident and suffered a broken right hand. Consequently, the claimant underwent surgery at Alabama Outpatient Surgery, in which Dr. Gary Russell placed two pins in her hand and casted it. Between January 3 and January 30, 2008, the claimant had follow-up appointments with Dr. Russell at Southern Orthopedics and Sports Medicine Associates. At each visit, Dr. Russell noted that the claimant's hand was stiff and weak, eventually diagnosing her with reflex sympathetic dystrophy (RSD) and referring her to physical therapy. On January 21, Dr. Russell removed the pins in the claimant's hands and scheduled an anesthetic injection into the nerves in her neck on February 5 to prevent pain. (R. 47, 241-43).

From that point, the record contains no relevant medical evidence until February 1, 2011, when the claimant presented to the Northwest Alabama Mental Health Center. She noted she had been a client over 20 years prior and sought to re-establish herself as a patient. The claimant told therapist Sondra Wightman that her symptoms of depression, anxiety, and panic attacks had increased; that simple activities such as walking down the sidewalk or stopping at a red light cause her to have panic attacks because she "thinks people are staring at her"; that she previously

attempted suicide in 1990 and was hospitalized as a result; and that she thought of suicide again "two months ago, after a really bad day at work." (R. 260).

Regarding her interests, the claimant told Ms. Wightman that she "does not have a lot of interest or energy," aside from watching television at home. Ms. Wightman noted that the claimant's current depressive state, along with her anxiety and panic attacks, cause emotional discomfort and impairs her ability to "enjoy daily activities to the fullest and perform appropriately at work." (R. 260).

Between August 26, 2011 and September 24, 2013, the claimant continued her therapy sessions with Ms. Wightman at the Northwest Alabama Mental Health Center. Based on Ms. Wightman's notes, the psychiatrist diagnosed the claimant with "severe" major depressive disorder and prescribed her Paroxetine and Bupropion for depression and anxiety.[1] (R. 254-94, 348-50).

The claimant visited Dr. Arthur Patton, an internal medicine doctor at Norwood Clinic, for the first time on September 24, 2013, complaining of a severe migraine headache "like her usual migraines, only worse." During his physical examination of the claimant, Dr. Patton noted that the claimant demonstrated "moderate pain behavior with vomiting." Dr. Patton diagnosed the claimant with a migraine headache and ordered injections of Phenergan and Toradol, and prescribed acetaminophen. (R. 246-47).

Between September 24, 2013 and December 3, 2014, the claimant continued meeting with Ms. Wightman who noted that her conditions remained the same. The claimant repeatedly stated that she was depressed and lacked energy. (R. 252, 269, 299, 301-02, 304, 306-07, 309, 311-12, 314-19, 321-22, 324, 326, 330).

---

[1] The only record showing the psychiatrist's name is an unidentifiable signature.

On December 3, 2014, the claimant saw Dr. John Cantrell, an internal medicine doctor at St. Vincent's Gardendale Clinic, seeking to become a patient. She explained her history with depression and anxiety and stated that her migraines had worsened in the past two months. Dr. Cantrell noted the claimant's anxiety and depression as "abnormal," and further noted a finding of pain and RPS in her right hand. Dr. Cantrell diagnosed the claimant with obsessive compulsive disorder (OCD), migraines, joint pain, insomnia, chronic pain syndrome, and depression. He prescribed acetaminophen for her migraines, Lyrica and Zanaflex for chronic pain, and Paxil and Wellbutrin for depression and OCD. (R 404-07).

One month later, on January 2, 2015, the claimant returned to Dr. Cantrell. She stated that she could not afford Lyrica; had an eating disorder, chronic pain syndrome, and depression; and wanted to know if she could be tested for fibromyalgia. She further informed Dr. Cantrell that she was filing for disability because she could not work. During his physical examination, Dr. Cantrell noted the same findings as the prior appointment. Dr. Cantrell advised the claimant to stop taking Lyrica and continue taking Zanaflex for chronic pain. (R. 400-02, 508-10).

At the request of the Social Security Administration, the claimant completed a "Function Report-Adult" on January 8, 2015. In that report, the claimant stated that, because of her pain and OCD, she "takes longer" to dress and bathe. The claimant further stated that the "pain and stiffness" of her right hand does not allow her to use utensils while eating and causes difficulty when shaving. She never cooks; she just prepares "easy microwave meals and sandwiches"; can clean the house; can do laundry once a week with the help of her mother; cannot do yard work because of "anxiety and panic attacks, severe fatigue and pain"; can drive alone, but only for "short distances [because of] panic attacks"; shops for groceries and personal care items twice a month for "around an hour and a half to two hours." (R. 191-96, 199).

Regarding her interests and activities, the claimant reported that she only watches television during the day if she does not have a migraine. The claimant explained watching television "seems to help some with [her] depression." The claimant further reported that, because of her social anxiety, she has no friends and only spends time with her mother, sister, and father. In addition, the claimant mentioned she has anger problems and "can fly off the handle" when interacting with others. She mentioned she does not go anywhere on a regular basis, with the exception of doctor's visits "about two to three a month" and running errands "about twice a month." She explained that during these outings, her mother usually comes along; however if she does not, the claimant can still go alone but she experiences more panic attacks. (R. 196-97, 199).

Concerning her abilities, the claimant mentioned she has "pain and stiffness all over" and experiences severe pain and difficulty when lifting, squatting, bending, standing, reaching, walking, kneeling, talking, climbing stairs, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others. The claimant stated that she can walk for "about fifteen minutes" before needing to stop and rest anywhere from "five to ten minutes" before she can resume walking. The claimant reported that she can only pay attention for "one to two minutes"; does not finish what she starts; does not follow written or spoken instructions well; does not get along with authority figures well; has been fired because of problems getting along with other people; does not handle stress or routine changes well; and has noticed increased "fear that something bad is going to happen" and as a result, she "mostly just want[s] to lay in bed and not get up." (R. 197-98).

The same day, the claimant's mother, Mary Evelyn Pennington, completed a "Function Report-Adult-Third Party" similar to the report completed by the claimant. Ms. Pennington

reported that the claimant's migraines, depression, and pain "keep her in bed a lot," and that she "stays extremely nervous and has trouble sleeping without mental health prescriptions." Regarding the claimant's personal care, Ms. Pennington's statements were identical to the claimant's in that the pain and OCD make it difficult for her to perform simple tasks. Ms. Pennington explained that she takes the claimant food because the claimant can only prepare "cereal or frozen dinners." In addition, Ms. Pennington explained that she cuts the claimant's grass and helps her with laundry and cleaning because the claimant is "not able and gets too stressed." Ms. Pennington further stated that it is "hard for [the claimant] to go out because of panic attacks and depression," and when the claimant does go out, she is "usually with [the claimant]." (R. 183-87).

Concerning the claimant's interests, abilities, and activities, Ms. Pennington's statements were reflective of the claimant's. Ms. Pennington mentioned the claimant's only activity is watching television; she only spends time with family because of her social anxiety; she does not go out on a regular basis because of depression and panic attacks; and her pain and stiffness affect any movement she makes. Furthermore, Ms. Pennington stated the claimant "has trouble concentrating" on written instructions; does not follow spoken instructions well; does not get along well with authority figures; does not handle stress or routine changes well; and "seems to be more depressed and nervous." (R. 187-89).

On January 19, 2015, at the request of Dr. Cantrell, the claimant met with Dr. Gene Watterson at Alabama Orthopedic, Spine, & Sports Medicine Associates. She complained of a "suspected diagnosis of fibromyalgia." After the claimant described continued pain, Dr. Watterson performed a physical exam in which he noted that the pain stemmed from tender

points; as a result, Dr. Watterson determined that his findings and the claimant's pain as mentioned supported a diagnosis of fibromyalgia. (R. 417, 420).

At the request of the Social Security Administration, the claimant met with Dr. Susan Corbin at Jasper Medical & Psychological Associates. The claimant informed Dr. Corbin that she lost ten pounds in the past two months because of her eating disorder. The claimant additionally stated that she began having depressive symptoms when she was a child, having overdosed on Tylenol at age ten. The claimant reported two additional suicide attempts: one at age twenty-two and one at age seventeen.[2] She explained to Dr. Corbin that she "often had suicidal ideations and may make plans but she would not follow through because it would really hurt her family." (R. 435-36).

When asked to describe her state of mind the past month, the claimant stated she had been "depressed and anxious"; "was often worried something bad would happen"; and had panic attacks anytime she believed people were looking at her. Dr. Corbin noted that the claimant showed "evidence of a marked impairment in her social relating" and that she "seemed to be quite disabled by her various reported psychiatric problems." Dr. Corbin diagnosed the claimant with major depressive disorder, panic disorder, and OCD. Dr. Corbin determined that "it is not likely and perhaps not a good idea for her to try to work as long as she is struggling with the cognitive symptoms of her various conditions." (R. 436-39).

Between January 13 and April 1, 2015, the claimant had four sessions with Ms. Wightman who noted that the claimant's conditions remained the same. The claimant repeatedly stated that her depressive symptoms were not subsiding. (R. 421-33).

---

[2] The record does not contain any objective medical evidence regarding the discussed suicide attempts.

Between April 1, 2015 and June 24, 2015, the claimant had three visits with Dr. Watterson. During each visit, Dr. Watterson noted the claimant's condition remained unchanged because she still experienced depressive symptoms and fibromyalgia pain. Dr. Watterson continued to prescribe the claimant Wellbutrin, Trazodone, Paxil, and acetaminophen. (R. 489-90).

On September 2, 2015, the claimant again met with Dr. Patton at Norwood Clinic, seeking to re-establish herself as his patient. She informed Dr. Patton that she had experienced difficulty in sleeping because of her migraines and fibromyalgia. Dr. Patton noted that the claimant appeared anxious. He prescribed Topamax to help with her sleeping difficulties and refilled acetaminophen and Paxil prescriptions. (R. 558, 562).

From September 2, 2015 to June 1, 2016, the claimant had nine session with Ms. Wightman who noted that her conditions remained unchanged. The claimant stated multiple times that her depression was worsening. (R. 534-75).

The record contains no additional relevant medical evidence until January 25, 2016, when the claimant met with Dr. Brian Maloney, a psychiatrist, at Dr. Patton's referral. During that visit, Dr. Maloney gave the claimant a form called the "Geriatric Depression Scale" to complete. The claimant stated on the form that she is not satisfied with her life; has not discontinued any activities and interests; feels her life is empty; often gets bored; is afraid that something bad is going to happen to her; does not feel happy most of the time; does not feel helpless; prefers to stay home; has memory problems; does not think "it's wonderful to be alive"; feels worthless; does not have energy; and thinks that "most people are better off than [her]." However she also stated that she "does not feel her situation is hopeless." Upon completing the evaluation, the

claimant's score was "10."[3] The claimant informed Dr. Maloney of her history with depression

and her difficulty working. Specifically, the claimant explained her anxiety levels were so high

that she would "leave the room with patients because [she] couldn't think and felt like [she] was

going to lose control." She further stated that she reached the point where her anxiety prevents

her from getting out of her car. Between then and July 29, 2016, the claimant continued to see

Dr. Maloney once a month. At each visit, she completed the same "Geriatric Depression Scale,"

and her answers remained the same.  (R. 512-33).

On February 17, 2016, the claimant again presented to Norwood Clinic to meet with Dr.

Patton. She complained of "significant fatigue," and reported "difficulty in getting activities of

daily living performed." Dr. Patton determined that "depression and worry and nerve condition

largely contributed to her feeling poorly." He prescribed the claimant Topamax to assist with

sleeping and migraines. (R. 548-53).

On June 20, 2016, the claimant met with Dr. Patton again, complaining of worsening

fibromyalgia symptoms and headaches. The claimant's mother informed Dr. Patton that "she

frequently remains in her room or in bed complaining of headaches and feeling poorly." Dr.

Patton prescribed the claimant Topamax to improve headache control and sleep quality. (R. 539-

42).

On June 22, 2016, Dr. Patton sent a letter to the Social Security Administration,

explaining that she had treated the claimant "for many years."  She indicated that the claimant

has "chronic health problems with history of anxiety disorder with obsessive-compulsive

features, chronic migraine headaches, insomnia, prior diagnosis of fibromyalgia and prior

diagnosis of reflex sympathetic dystrophy."  Dr. Patton acknowledged that the claimant

---

[3] A score greater than "5" indicates probable depression.

"continues to struggle with mental health problems" and has difficulty "leav[ing] her house." Dr. Patton stated that the claimant's multiple physical and mental problems have "evidenced chronicity to the point where [he] believes she is no longer employable and should seek Social Security Disability." At the end of her letter, Dr. Patton stated that "[f]or additional information, please contact [her] office." (R. 537-38).

The claimant called Dr. Patton's office on June 29, 2016 complaining that she could not "tell any difference" on the Topamax and reported continuing to have two migraines a week. Dr. Patton wanted to continue the claimant on 100 mg of Topamax nightly for several more weeks before making any other medication changes. (R. 536).

*The ALJ Hearing*

At the hearing before the ALJ on August 31, 2016, the claimant testified she worked as a physical therapist assistant from 1995 to December 28, 2014. She stated she quit working because she felt "so overwhelmed" because of her anxiety and depression and felt a "heavy weight and burden on [her] chest all the time." The claimant further stated that "every time [she] would get under stress [she] would have migraines and panic attacks and [she] just couldn't deal with stress and working with people." (R. 40, 52).

When asked why she cannot work, the claimant testified that her anxiety and depression rose to such a high level that she was afraid she would "end up hurting a patient or [herself] if [she] kept going like that." She stated that she could not go to work because of her anxiety at times. The claimant explained that, when she has anxiety attacks, she feels as if she has to escape from where she is and has "this overwhelming feeling that something bad is going to happen." She testified that her attacks can vary, sometimes lasting up to five minutes or more. She further testified that she experiences "at least one or two" attacks whenever she is around people and

that sometimes her attacks become so severe that she cannot leave her house. When her attacks reach that level of severity, the claimant stays in her bed in the "fetal position" with the television on in the background. (R. 41-43).

In addition to anxiety and depression, the claimant also discussed her problems with OCD. The claimant testified that she repetitively checks things and it "takes [her] a lot longer to do anything than it does a regular person" because she is "very particular in how she does everything." She stated that her condition has worsened over the last several years. She takes Paxil, but it "just doesn't seem to be helping as much as it used to." (R. 49).

Regarding her physical problems, the claimant mentioned she began experiencing migraines when she was twelve years old. While she was working, the claimant would have to take "six or eight" Extra Strength Acetaminophen to prevent nausea and vomiting so that she could continue to work, and not lose her job. (R. 44).

In addition to migraines, the claimant also discussed her problems with fibromyalgia. When asked how it affects her, the claimant explained she "basically hurts all the time," in her "hands, back, and knees." She stated that she tested positive for tender points, supporting a diagnosis of fibromyalgia. The claimant testified that her condition allows her to sit for "up to one hour" and walk "up to ten minutes." The claimant further testified that she has to lie down for six out of eight hours in a day because of her pain. (R. 46-47).

Next, the claimant discussed her problems with reflex sympathetic dystrophy. The claimant testified that she was in an automobile wreck in November 2007 and broke her right hand. She explained that her right hand—her dominant hand—is now in a cast, "a lot weaker," and "a lot more stiff and painful." The claimant stated that she cannot "pick up heavier objects" with her right hand since the accident, but her left hand has not decreased in ability. She

explained that she cannot pick up a gallon of milk with her right hand but can do so with her left, or both. The claimant explained that she can pour coffee and prepare a bowl of cereal. The claimant also mentioned that her RSD has worsened since she had the accident. (R. 48-51).

In describing a typical day, the claimant explained that she wakes up, drinks coffee, watches television and goes back to bed. She stated that she "basically stays in bed most of the day," except when she gets up to eat. She testified that she does not participate in any social activities or have any friends because of her social anxiety. When asked if her medication helped, the claimant mentioned that if she "wasn't on it, it would be worse," but "it just doesn't seem to help as much as it used to." (R. 55-58).

The claimant explained that, since she quit her job in December 2014, her condition grew worse and her parents moved in to "keep [her] from doing any real harm to herself." The claimant stated that her mother does "everything," such as cooking, washing dishes, and laundry. The claimant explained that her OCD causes her to repeat tasks to satisfy herself, in turn creating anxiety to the point where she cannot perform any tasks. (R. 55-58).

A vocational expert, Ms. Civils, testified concerning the type and availability of jobs that claimant can perform. Ms. Civils testified that the claimant's past relevant work is a physical therapy assistant, classified as medium, skilled work; however, she explained that the record indicated the claimant performed at the "very heavy level." The ALJ asked Ms. Civils to assume a hypothetical individual the same age, education, and experience as the claimant who is limited to performing simple, repetitive, noncomplex tasks at the medium exertional level; cannot meet productions goals or quotas; can only have casual contact with the general public; and can occasionally stoop and crouch. Ms. Civils testified that individual could not perform the claimant's past work, but that individual could work as a "laundry worker," classified as

medium, unskilled work, with 600 jobs in Alabama and 50,000 jobs nationally; "cook helper," classified as medium, unskilled work, with 3,800 jobs in Alabama and 271,000 nationally; "marker," classified as light, unskilled work, with 900 jobs in Alabama and 70,000 nationally; "cleaner/housekeeping," classified as light, unskilled work, with 1,400 jobs in Alabama and 137,000 jobs nationally; "table worker/inspector sorter," classified as sedentary, unskilled work, with 700 jobs in Alabama and 35,000 nationally; and "document preparer/scanning," classified as sedentary, unskilled work, with 500 jobs in Alabama and 46,000 nationally. (R. 59-62, 65).

In his second hypothetical, the ALJ asked Ms. Civils to assume all of the prior limitations except that the individual "can only occasionally" push or pull. Ms. Civils testified that individual could perform the work of "marker," "table worker/inspector sorter," and "document preparer." (R. 63).

In his third hypothetical, the ALJ asked Ms. Civils to consider the original hypothetical except that the individual can only sit for one hour. Ms. Civils testified that individual could work as a "table worker/inspector sorter," "marker," and "cleaner/housekeeping." The ALJ then asked Ms. Civils to consider that individual only being able to stand or walk for ten minutes. Ms. Civils testified that individual could perform sedentary work such as "table worker/inspector sorter," and "document preparer/scanning." (R. 64).

Finally, the ALJ asked Ms. Civils to assume the limitations of the original hypothetical except that the individual can only engage in occasional contact with coworkers and supervisors. Ms. Civils testified that individual could perform work as a "marker" and as a "laundry worker." When the ALJ asked Ms. Civils to consider if the claimant could not have any contact with coworkers, supervisors, or the general public, she testified that the claimant could not work at

any of the jobs she mentioned. She further stated that the claimant could not work if she needed to lie down "between one to two hours during a work tour."  (R. 65-66).

*The ALJ's Decision*

On January 24, 2017, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirement of the Social Security Act through December 31, 2018, and had not engaged in substantial gainful activity since her alleged onset date of December 28, 2014. (R. 20).

Next, the ALJ found that the claimant had the severe impairments of major depressive disorder, recurrent, without psychotic features; anxiety; complex regional pain syndrome; fibromyalgia; and migraine headaches. The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20.)

The ALJ considered whether the claimant met the criteria for Listings 12.04 and 12.06, but concluded that the claimant only had moderate restrictions in her daily living and social functioning and moderate limitations in her ability to maintain concentration, persistence, or pace. To support his conclusion, the ALJ noted the claimant's abilities "to fix simple meals like cereal," to drive a car, and to perform household chores once a week with assistance. Additionally, the ALJ noted the claimant's abilities to socialize with her family and go to the grocery store twice a month; the fact that the claimant spends most of her time watching television, "which requires some concentration to perform"; and the fact that "the claimant reportedly has a short temper with authority but has never been terminated from a job for failing to get along with others." (R. 20-21).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work but can perform only simple, repetitive, non-complex tasks; cannot meet production goals or quotas; can have casual contact with the general public; can occasionally stoop, crouch, push, and pull; and can have occasional contact with supervisors and coworkers. (R. 22).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were inconsistent with the evidence. Specifically, the ALJ noted that the claimant was able to return to work following her right hand fracture and that she did not follow-up regarding that condition. He also stated that, although the claimant continuously sought mental health treatment, she reported that her "medication helps with some of her symptoms." Regarding her fibromyalgia, because the claimant stopped her follow-up appointments for three months, the ALJ found that her symptoms were not at the level she reported. The ALJ further noted that the claimant was still experiencing weekly headaches as recently as June 2016; however he ultimately determined that her symptoms were not equivalent to her complaints. (R. 23-24).

The ALJ gave little weight to the opinion of the claimant's treating physician Dr. Patton. In making this determination, the ALJ reasoned that "whether the claimant is disabled is an issue reserved to the Commissioner." The ALJ further articulated without explanation that the claimant's treating records "do not support an inability to work at all exertional levels."

In addition, the ALJ mentioned consultative examiner Dr. Corbin's opinion but did not state the weight he gave it because "Dr. Corbin did not provide any specific functional

limitations based on her evaluation." The ALJ also indicated that his residual functioning capacity determination was "supported by" the "psychological evaluation by Dr. Corbin." (R. 24-25).

Finally, the ALJ found that the claimant was unable to perform any of her past relevant work, but could work as a "marker," with 900 jobs in the state of Alabama and 70,000 in the nation. In making this determination, the ALJ relied on the testimony of the vocational expert Ms. Civils, who testified that the claimant would be able to perform occupations at the light level of exertion. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 26).

## DISCUSSION

The claimant argues that the ALJ erred in failing to state the weight he gave to the opinion of the consultative examiner Dr. Susan Corbin and in his description of the substance of Dr. Corbin's opinion. This court agrees.

The ALJ did not state the weight he gave the opinion of Dr. Corbin, a consulting, examining psychologist hired by the Social Security Administration to evaluate the claimant. The ALJ mentioned Dr. Corbin's opinion and stated, with no explanation, that it supported the ALJ's residual functioning capacity determination. But, he failed to state or explain with any particularity the weight he gave that opinion. The ALJ's failure to do so was reversible error. *See Romeo*, 686 F. App'x at 732 (failure of the ALJ to state with particularity the weight given to a medical opinion is reversible error).

Not only did the ALJ fail to state with particularity the weight he afforded Dr. Corbin's opinion, his minimal assessment of that opinion was incorrect. The ALJ stated that "Dr. Corbin did not provide any specific functional limitations based on her evaluation." (R. 24). To the

contrary, Dr. Corbin specifically stated that the claimant showed "evidence of a marked impairment in her social relating" and that she "seemed to be quite disabled by her various reported psychiatric problems."  Dr. Corbin's opinion that the claimant had *marked impairment* in *social relating* that severely affected her ability to work contains a specific functional limitation.

Also, contrary to the ALJ's finding, Dr. Corbin's opinion regarding this marked impairment in social functioning did not support the ALJ's residual functioning capacity assessment that the claimant can have *casual contact with the general public* and *occasional contact with supervisors and coworkers*.  If the ALJ had given great weight to Dr. Corbin's opinion regarding a marked impairment in social functioning, that weight may have changed the ALJ's residual functioning capacity finding regarding social functioning limitations.  However, because the ALJ failed to acknowledge or give weight to Dr. Corbin's opinion about this marked limitation, the court cannot speculate regarding what weight the ALJ gave this opinion.

The court finds that the ALJ's failure to state with particularity the weight given to Dr. Corbin's opinion is reversible error.

*Other Concerns*

*Treating Physician's Opinion*

The court also expresses concern about the ALJ's failure to explain with more particularity the little weight given to the claimant's treating physician Dr. Patton's medical opinion.  The court agrees with the ALJ that the ultimate determination of disability lies with the ALJ. However, to disregard Dr. Patton's opinion that the claimant's chronic mental conditions limit the claimant's ability to "leave her house" or work on a full-time basis, the ALJ must do

more than give a conclusory statement that the claimant's treating records "do not support an inability to work at all exertional levels."

Dr. Patton treated the claimant for her medical conditions for many years and his opinion took into account his personal treatment of her and his knowledge of the severity of her conditions. Dr. Patton, as the claimant's treating physician, occupies the unique position to give his opinion concerning the severity of the claimant's medical conditions. "Generally, [the ALJ] give[s] more weight to medical opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *See* 20 C.F.R. § 416.927(c).

On remand, the ALJ should reconsider or at the very least state and explain with more particularity his reasons for discounting treating physician Dr. Patton's medical opinion regarding the severity of the claimant's conditions.

*Evaluation of Activities of Daily Living*

In assessing the claimant's subjective allegations of the limiting effects of her mental conditions, the ALJ found that the claimant's activities of daily living showed that she was not as limited as she claimed. The court shares the claimant's concern that substantial evidence does not support the ALJ's assessment of the claimant's activities of daily living. The facts that the claimant can pour coffee, drive a car, prepare microwavable meals and cereal, and *used to* perform household chores once a week *with assistance* do not negate the claimant's chronic pain and anxiety that would prevent her from working a normal eight-hour day. The claimant does not

claim to be an invalid who cannot do anything at all for herself, but instead claims that her physical and mental conditions severely limit her ability to work a normal workday. *See Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."). Just because the claimant can occasionally perform simple tasks on a very limited basis does not mean that the claimant does not have severe limitations that would prevent her from completing a typical eight-hour workday.

Additionally, the ALJ claims that the fact the claimant watches television indicates her ability to concentrate in a work environment. The ALJ chose to disregard the fact that the claimant watches television to "help with [her] depression." Furthermore, he omitted the significant fact that the claimant stated she sometimes leaves the television on as background noise when she is *hidden in her bed in the fetal position while experiencing an anxiety attack*. Contrary to the ALJ's finding, the ability to watch television in an effort to ease depressive symptoms does not reflect an ability to concentrate and work an eight-hour work day.

Moreover, the fact that the claimant goes to the grocery store twice a month does not demonstrate a lack of social anxiety. The record indicates that the claimant's mother typically accompanies her, but when she does not, the claimant admitted to experiencing more panic attacks. Additionally, the ALJ found that the fact that the claimant spends time with her family does not reflect someone with severe anxiety. However, the ALJ also noted that the claimant "does not participate in any social activities outside of her family," but somehow still arrived at the same conclusion. He disregarded the fact that the claimant mentioned she does not have any friends and does not go anywhere on a regular basis, with the exception of running errands a few times a month.

On remand, the ALJ should explain how the claimant's daily activities specifically contradict the limitations that the claimant alleges prevents her from working on a full-time basis.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 21st day of March, 2019.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE